AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>EIGHT ELECTRONIC DEVICES LISTED BELOW AND<br>IN ATTACHMENT A LOCATED WITH ATF AT 90 K<br>STREET, NORTHEAST, WASHINGTON, D.C. | )<br>)<br>)<br>)<br>)<br>)   Case No. 18-SW-350 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See affidavit and Attachment A, incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC § 841(a)(1) and<br>846; 922(A)(1)(a), 922(g) and<br>924(c). | Fruits, evidence, information relating to violations of contraband or<br>instrumentalities, in whatever form and however stored. |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven Letteney, Special Agent ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date: ___12/27/2018___

_____
*Judge's signature*

City and state: Washington D.C.

Robin M. Meriweather, Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  18-SW-350 |
| EIGHT ELECTRONIC DEVICES LISTED BELOW | ) | |
| AND IN ATTACHMENT A LOCATED WITH ATF AT | ) | |
| 90 K STREET, NORTHEAST, WASHINGTON, D.C. | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search **and seizure** of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    12/27/2018 0:00 am    _____

_____
*Judge's signature*

City and state:     Washington, D.C.    _____

Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>18-SW-350 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched is eight digital devices, further described in the table below, which are currently located in the custody of the ATF at 90 K Street N.E., Washington, D.C.

| Item # | Brief Description |
|---|---|
| 000048 | LAPTOP, SILVER APPLE LAPTOP S/N: W89516CA7XJ WITH CHARGER |
| 000049 | LAPTOP, GRAY HP LAPTOP S/N: CND84130YK |
| 000051 | CELL PHONE, SAMSUNG SM-G930P. MEID DEC: 089 476 327 104 739 168 |
| 000055 | CELL PHONE, SAMSUNG GALAXY S6 EDGE.  MODEL SM-G925P.  DC: 256 691 544 801 582 197 |
| 000056 | CELL PHONE, ALCATEL MODEL A570BL |
| 000057 | LAPTOP, DELL LAPTOP SERVICE TAG: HT9X5Q1 |
| 000066 | CELL PHONE, IPHONE A1688, PINK COLORED BACK. |
| 000067 | CELL PHONE, LG-C410 IMEI: 013 808 008 710 486 |

## **ATTACHMENT B**

### PROPERTY TO BE SEIZED

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Sections 922(A)(1)(a), 922(g), and 924(c) (the "target offenses"), as described in the search warrant affidavit, including, but not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data:

(i)     establishing or documenting the preparation to commit or the commission of the target offenses;

(ii)    identifying locations where the individual committed the target offenses, traveled to before and after the commission of the target offenses, and in preparation for the target offenses;

(iii)   reflecting the ownership and use of the items identified in Attachment A by the individual committing the target offenses;

(iv)    documenting meetings and communications between individuals committing one or more of the target offenses;

(v)     reflecting communications between the individual committing one or more of the target offenses and other individuals, discussing the commission of one or more of the target offenses;

(vi)     reflecting communications between the individual committing one or more of the target offenses and other individuals who may have assisted or provided support in the commission of one or more of the target offenses;

(vii)    containing photographs or video that would constitute evidence of a violation of the target offenses;

(viii)   documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics in violation of 21 U.S.C. § 841(a)(1), which would constitute evidence of one of the target offenses; and

(ix)     documenting or containing evidence of the purchase of items from the assets derived from the commission of a narcotics trafficking offense in violation of 21 U.S.C. § 841(a)(1), or of a firearms trafficking offense, in violation of 18 U.S.C. § 922(a)(1)(A) which would constitute evidence of one of the target offenses.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

EIGHT ELECTRONIC DEVICES
LISTED BELOW AND IN
ATTACHMENT A LOCATED WITH
ATF AT 90 K STREET, NORTHEAST,
WASHINGTON, D.C.

18-SW-350

**UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Steven Letteney, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Washington Field Division, Washington, D.C. (hereinafter "Affiant"), being duly sworn, deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your affiant is a Special Agent with the ATF, and has been so employed since October 2014.  Before my employment with ATF, your affiant was a Special Agent with the U.S. Department of State, Diplomatic Security Service, for approximately five years.  Your affiant is an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.  Your affiant has received training and experience in interviewing and interrogation techniques, surveillance techniques, arrest procedures, search and seizure, and asset forfeiture.  Your affiant has also been involved in gang, organized crime, money laundering, and drug investigations, including the possession with intent to distribute and distribution of controlled substances, and conspiracies and offenses associated with the foregoing criminal offenses which are prohibited by Title 21, United States Code, Sections 802(32), 813, 841(a)(1) and 846, Title 21, United States

1

Code, Section 848(e)(1)(A) and Title 18, United States Code, Sections 922(g), 924(c), 1956 and 1957 and Title 26, United States Code, Section 5861(d) among others.

2.      Your affiant is presently assigned to Group III of the Washington Field Division of the ATF in Washington, D.C.   This particular Group investigates violent street gangs and crews in Washington, D.C. in which most members are involved in the distribution of narcotics, which also may involve firearms and the illegal trafficking of firearms.   In the course of my training and experience, your affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.   In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing caller identification system data; and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

3.      Through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business, including the transportation of narcotics from importers to wholesalers and from wholesalers to street level dealers, as well as the packaging and hiding of narcotics, payment methods for narcotics, and laundering of the proceeds of illegal narcotics transactions.   Based on this training and experience, your affiant has learned that, among other things, narcotics traffickers use computers and cellular telephones to further their illegal activities and in many cases drug dealers will frequently "dump" or discard their phones and/or phone numbers in the belief that, by so

2

doing, they can avoid detection and thwart the efforts of law enforcement.   Computers and cellular telephones also enable co-conspirators to remain in constant or ready communication with one another without restricting either party to a particular geographic location, thus hampering surveillance by law enforcement authorities.   Additionally, narcotics traffickers usually do not expressly refer to synthetic cannabinoids, heroin, phencyclidine (PCP), or other controlled substances by name, and, when they do so, it is most often a mistake.   Instead, they routinely refer to drugs and drug quantities – and also quantities of cash – by using seemingly innocuous words or phrases in an effort to conceal the true nature of their illegal activities and thwart detection by law enforcement.   Narcotics traffickers also frequently have access to several computers and cellular telephones and they periodically use newly acquired computers and cellular telephones, or frequently change cellular telephones, to avoid detection and attempt to thwart apprehension by law enforcement.   These cellular telephones are often prepaid cellular telephones which are frequently not registered or subscribed to in the purchaser's or primary user's name.

4.     Your affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic devices listed in attachment A. On September 25, 2018, a grand jury for the United States District Court for the District of Columbia returned a nineteen count indictment charging EDWARD TOWLES, JR. and STEPHANIE PAULINO, among others, with conspiracy to distribute and possession with the intent to distribute narcotics, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.   The indictment charges that these individuals along with several others were involved in a long-term conspiracy, between October 2017 continuing up to and including September 2018. This affidavit seeks authorization to search and seize evidence from the following electronic devices which were seized during the search of their residence pursuant to previously issued

3

United States District Court Search and Seizure Warrants. Further, your affiant alleges the facts to show that there is probable cause to believe that evidence and instrumentalities of the aforementioned violations of the United States Code are contained within the below listed electronic devices.[1]

## BACKGROUND

5.     All information contained in this affidavit is either personally known to me or has been related to me by other law enforcement officers and/or other witnesses, or has been obtained from records and documents gathered during the course of this investigation.   This affidavit contains information necessary to support probable cause for the search of the **Target Devices**. The information contained in this affidavit is for the limited purpose of supporting the search and is not intended to include each and every fact and matter observed by or known to the affiant.

6.     Your affiant knows that computers and cellular telephones are tools of the drug trade. Drug traffickers communicate with customers, suppliers, and co-conspirators via computers and cellular telephones. Drug traffickers use computers and cellular telephones to arrange meetings, request drugs, take drug orders, and arrange for co-conspirators to obtain and distribute drugs. To avoid detection by law enforcement, drug traffickers commonly use more than one cellular telephone and often send text messages, rather than engage in oral communications.

7.     Your affiant knows that computers and cellular telephones used by drug traffickers contain valuable information and evidence relating to their drug trafficking.   Such information

---

[1] It is noted that contained within this affidavit the term "target offenses" is to mean conspiracy to distribute and possession with the intent to distribute narcotics, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, conspiracy to engage in the dealing of firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 371, aiding and abetting, in violation of Title 18, United States Code, Section 2, and Carrying, Using or Possessing a Firearm in Connection with a Crime of Violence or Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c), use of a communication facility in facilitating the commission of a drug crime in violation of Title 21, United States Code Section 843(b), or possession of a firearm by a convicted felon in violation of Title 18, United States Code Section 922(g)(1).

4

consists of, but is not limited to, call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System (GPS) data, browser history, and any other stored electronic data.  This information can (i) reflect the preparation for, arrangement of, and commission of the trafficking of drugs; (ii) identify locations where drug traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the computers and cellular telephones by the drug traffickers; (iv) document meetings and communications between drug traffickers, their customers, associates, and co-conspirators; (v) reflect communications between drug traffickers and other individuals, discussing the trafficking of narcotics; (vi) reflect communications between drug traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, cutting, manufacturing, transferring, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

8.      Your affiant knows that individuals involved in drug trafficking often use cellphone cameras to take pictures and video of themselves as well as other members of their organization, often engaging in illegal activities such as the distribution of narcotics and the possession of firearms, as well as to take pictures of assets acquired with the proceeds of drug trafficking.

9.      Your affiant knows that individuals involved in drug trafficking often use cellphone video recording devices to take video recordings of other members of their organization often engaging in illegal activities such as the distribution of narcotics, as well as video recordings documenting the purchase of assets with the proceeds of narcotics trafficking.

5

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

10.     Based on your affiant's training and experience, your affiant uses the following technical terms to convey the following meanings:

a.     Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

6

c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS: A Global Positioning System ("GPS") navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which,

7

like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

        f.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        g.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

11.     Based on your affiant's training, experience, and research, your affiant has reason to believe that the Target Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and internet search device.   In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

12.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time.  Similarly, things that have

8

been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

      13.     There is probable cause to believe that things that were once stored on the Target Devices may still be stored there, for at least the following reasons:

      a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

9

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

14. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

10

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the Target Devices consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Devices to human inspection in order to determine whether they contain evidence described by the warrant.

16.     *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## PROBABLE CAUSE

16.     As described in greater detail below, evidence obtained from the judicially-authorized interception of wire communications of telephones used by DERRICK BOYD and

11

EDWARD TOWLES established that TOWLES conspired with others to traffic in narcotics and firearms from at least March 2018 until his arrest in July 2018, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Sections 922(A)(1)(a), 922(g),[2] and 924(c).[3]

17.     On March 8, 2018, at 9:43 p.m., (TT-4, <u>Activation #329</u>), DERRICK BOYD received a call from EDWARD TOWLES on the Target Telephone. During the conversation, TOWLES stated, "What's up?   I hit you on the other joint, but, um, I'm 'bout to ride out halfway to meet my man out from Eastern Shore, right?"     BOYD replied, "Un huh."     TOWLES continued, "He said he got some shit that, um, he said it's 7-5 but he say he threw three on it and they still love it."     BOYD replied, "Damn."     TOWLES continued, "So, I'm 'bout to go grab that.   I'm just gone grab 10, cuz everytime I go on that side that's all they keep asking about."

---

[2]     Your Affiant is aware TOWLES is prohibited from owning or possessing firearms due to the fact he is a convicted felon.   According to a NCIC query, on January 31, 2009, TOWLES was arrested for Involuntary Manslaughter and Carrying a Handgun.   On February 23, 2010, he was convicted in the Seventh Judicial Circuit Court and was sentenced to five years for manslaughter and two years for carrying a handgun, both to be served concurrently.

[3]     On March 7, 2018, the Honorable Amit P. Mehta, United States District Court for the District of Columbia, issued an order authorizing the interception of wire and electronic communications to and from TT-4 (202-491-8351), which is utilized by Derrick BOYD.   Interceptions began on March 7, 2018 and continued through April 5, 2018, at which time the Honorable Amit P. Mehta, United States District Court for the District of Columbia, issued an order (18-wt-001) reauthorizing the interception of wire and electronic communications to and from TT-4 (202-491-8351). Interceptions continued until April 8, 2018, when the FBI assessed that BOYD had primarily stopped using TT-4 for criminal activity and that he had now begun using TT-6 (202-491-7306).   On April 19, 2018, the Honorable Amit P. Mehta, United States District Court for the District of Columbia, signed an orders (18-wt-003) authorizing the interception of wire and electronic communications over cellular telephone number (202) 491-7306 (hereinafter referred to as Target Telephone 6, "TT-6") used by BOYD.   Interceptions on TT-6 began on April 19, 2018, and continued through May 11, 2018.   On June 1, 2018, the Honorable Amit P. Mehta, United States District Court for the District of Columbia, signed an order (18-wt-005) authorizing the interception of wire and electronic (text message) communications over cellular telephone number (202) 910-2831 (hereinafter referred to as Target Telephone 7, "TT-7") used by BOYD. Monitoring concerning TT-7 began on June 1, 2018, and terminated on June 30, 2018. On July 3, 2018, the Court, in Misc. No. 18-wt-005 (APM), authorized the FBI to renew intercepting wire and electronic communications over TT-7. Monitoring concerning TT-7 began again on July 3, 2018, and terminated on August 1, 2018. On August 15, 2018, the Court, in Misc. No. 18-wt-005 (APM), authorized the FBI to renew intercepting wire and electronic communications over Target Telephone 7 (or TT-7). Interceptions began on August 15, 2018, and terminated on September 4, 2018. On June 15, 2018, the Court, in Misc. No. 18-wt-006 (APM), authorized the FBI to begin intercepting wire communications over telephone number (240) 623-6325, Target Telephone 8 (or TT-8) for the investigation. Monitoring concerning TT-8, a telephone number used by TOWLES, began on June 15, 2018, and terminated on July 11, 2018.

BOYD replied, "Wow."   TOWLES stated, "So I need that.   It's like a need now.   You know what I'm saying?"   BOYD stated, "Right, right, right, right."   A short while later, TOWLES stated, "And so um... I'm probably gone grab the probably two, I'ma bring it back, let you see two, then if it do, I already told him I said I already know what he gone want so."   TOWLES further stated, "I mean don't get me wrong, I know a 6-5, you know what I'm saying because he told me before, he just adding his little 10 on it but if it be that I'm good."   BOYD informed TOWLES that he was at work.   TOWLES apologized but stated that he was "about to ride out there tonight."   BOYD replied, "Oh you going out there tonight?"   TOWLES stated, "Yeah me and my girl 'bout to ride like an hour, half way hour."   BOYD replied, "A'ight, that's a bet. Y'all be safe.   Call me when you get back.   I'm probably gonna get off in a minute though."   TOWLES replied, "A'ight matter of fact, shit, nah, she gone be tired.   I'll just see you tomorrow."   Based on your affiant's training and experience, your affiant understands that during this portion of the conversation, TOWLES advised BOYD that TOWLES had heard from TOWLES's source of supply that he had narcotics ("some shit") to distribute.   The source of supply further indicated that the narcotics could be 'cut' three additional times for resale ("threw three on it"), because the product was still high in quality.   TOWLES indicated that the weight of the narcotics would be 75 grams ("it's 7-5").   TOWLES further indicated that the amount initially would have been 65 grams ("a 6-5") for the narcotics but that the source of supply was adding 10 grams of a cutting agent ("adding his little 10 on it").

18.      On March 11, 2018, at approximately 6:28 p.m., (TT-4, Activation #867), BOYD received a call from TOWLES on the Target Telephone.   TOWLES and BOYD were located in different places at the time of this call.   During the course of the call, TOWLES told BOYD, "Imma about to shoot in the house cause they cooking."   BOYD later told TOWLES, "Imma

13

about to go in the house my motherfucking self. I might come back out, it's slow as shit around here." Your affiant understands from training and experience that TOWLES was informing BOYD he was returning to a house where people working for him were turning powder cocaine into crack cocaine ("cause they cooking"). BOYD told TOWLES he was also probably going in to a different house because there were not a lot of people purchasing drugs from him at this time ("it's slow as shit around here").

19.     During the course of the investigation, law enforcement determined that TOWLES utilized a Chevrolet Impala with Maryland license plate number 5DF8904 in connection with his narcotics trafficking activities.  On April 20, 2018, the Honorable Gina L. Simms, United States Magistrate Judge for the District of Maryland signed a Tracking Warrant for the Chevrolet Impala with Maryland license plate number 5DF8904 under case number GLS-18-939.  On June 5, 2018, the Honorable Charles B. Day, United States Magistrate Judge for the District of Maryland signed an extension of the Tracking Warrant for the Chevrolet Impala for an additional 45 days under case number CBD-18-1545.  On June 28, 2018, the Honorable Charles B. Day, United States Magistrate Judge for the District of Maryland signed a second extension of the Tracking Warrant for the Chevrolet Impala for an additional 45 days under case number CBD-18-1545.

20.     On April 24, 2018, your affiant conducted electronic surveillance of the vicinity of the 300 block of 18th Place Northeast.  At approximately 2:55 p.m., a black Chevrolet Impala operated by TOWLES arrived at the 300 block of 18th Place Northeast. TOWLES exited the vehicle while speaking on a cellular telephone, and walked towards 316 18th Place Northeast.  At 2:58 p.m., TOWLES and an unidentified black male returned from the vicinity of 316 18th Place Northeast and walked to the rear of TOWLES's Impala.  TOWLES opened the trunk of the Impala and removed a white bucket with a covered top from it. TOWLES and the unidentified

14

black male then entered the Impala, with TOWLES sitting in the driver's seat. At approximately 2:59 p.m., TOWLES and the unidentified black male exited TOWLES's vehicle and TOWLES returned the white bucket to the trunk of his Impala. The unidentified black male walked back across the street to the vicinity of 316 18th Place Northeast. At 4:00 p.m., a second unidentified black male arrived at the block of 300 18th Place Northeast in a black Nissan with Virginia license plate number UYM-7269. The second unidentified black male walked to the driver's side window of BOYD's known GMC Yukon bearing Washington, D.C. license plate number FH9597, and engaged a person sitting in the driver's seat in conversation. At approximately 4:02 p.m., DERRICK BOYD walked over to the second unidentified black male and engaged him in conversation. At approximately 4:03 p.m., DERRICK BOYD and the second unidentified black male walked across the street and in to 316 18th Place Northeast. At approximately 4:15 p.m., the second unidentified black male returned from the vicinity of 316 18th Place Northeast with a white bucket similar in appearance to the bucket TOWLES arrived with earlier. The second unidentified black male walked to the black Nissan, put the bucket in the vehicle and departed the area. A review of the GPS data from the Impala showed that the Impala traveled from the area near 1953 19th Place, Southeast, Washington, D.C. to the 300 block of 18th Place, Northeast, Washington, D.C.

21. On April 29, 2018, at approximately 12:20 p.m., (Activation #1737), BOYD received a call from TOWLES using the target telephone. During the conversation, TOWLES stated, "What's up, Cuz? You still want them two?" BOYD replied, "I'mma call the dude now . . . see if he still want them." TOWLES then said, "Alright, let me know. I'm in the house and I'll put it together before I come out." BOYD replied, "Alright." Your affiant understands that here, BOYD and TOWLES discussed a narcotics transaction involving a "two" quantity of drugs

15

to be provided to a customer.  In this instance, TOWLES advised BOYD that he was at the stash location ("the house") and that he would put the drugs together before he came out once BOYD told him the customer still wanted the drugs.[4]  Thereafter, at 12:21 p.m., (Activation #1738), BOYD called an UNKNOWN MALE at (202) 207-5504.  During their conversation, BOYD asked, "You still need that?", and UM 5504 replied, "Yeah."  BOYD then responded, "Alright, let me call him back," and UM 5504 replied, "Ok."  Subsequently, at 12:21 p.m., (Activation #1739), BOYD called TOWLES on the target telephone.  BOYD then stated, "He need it," and TOWLES asked, "You said what, Cuz?"  BOYD then restated, "He need it," and TOWLES responded, "Alright, I'm about to do it; I'll put it together now."  BOYD replied, "Alright." Here, during the follow-up activations #1738 and #1739, your affiant understands that BOYD confirmed with the customer (UM 5504) that he still wanted to purchase drugs, then BOYD called TOWLES and informed TOWLES of the customer's ongoing intentions to get drugs at that time. TOWLES then said that he would package the requested drugs for redistribution.

22.     On June 1, 2018, investigators witnessed TOWLES in the Impala parked on Good Hope Road Southeast, Washington, D.C., adjacent to 1953 19th Place Southeast, Washington, D.C. TOWLES was later observed nearby the Impala with an unknown black male wearing a black t-

---

[4]      A review of the GPS data from the Impala showed that the Impala remained parked in the vicinity of 140 Moore Drive, Rockville, MD throughout the day on April 29, 2018.  However, your affiant is aware that throughout this investigation, TOWLES has also utilized a second vehicle: a Mercedes-Benz C300 sedan, bearing license plate number 6CP7869, which is also registered to STEPHANIE PAULINO at 140 Moore Drive, Rockville, MD.  While law enforcement obtained authorization to install a GPS tracker on the Mercedes-Benz on June 20, 2018, law enforcement does not have any location data for the Mercedes as of April 29, 2018.  In fact, at approximately 9:46 p.m., law enforcement agents conducting electronic surveillance observed the Mercedes-Benz sedan driving onto the 300 block of 18th Place Northeast, Washington, D.C.  TOWLES was then observed exiting the passenger side of the Mercedes-Benz sedan, opening and closing the trunk of said vehicle, and walking towards the area of 316 18th Place Northeast, Washington, D.C. with a backpack in hand.  TOWLES was later observed returning to the Mercedes-Benz sedan with a backpack on his shoulder, opening and closing the trunk of said vehicle, and then entering the passenger side without the backpack.  The Mercedes-Benz sedan then left the area a short time later.

shirt, green shorts and a black hat and carrying a backpack. TOWLES entered the driver seat of the Impala and the unknown black male entered the front passenger seat. A short time later, a black female wearing a black tank top, black pants and black shower cap approached the passenger side of the Impala. Law enforcement agents observed the second unknown female holding what appeared to be U.S. Currency in her left hand and reach into the vehicle with the same hand. Law enforcement agents then saw her withdraw her hand from the vehicle and appear to place an object into the waistband of her pants. Investigators believed this to be a hand-to-hand purchase of narcotics by the female from TOWLES. Additionally, investigators observed TOWLES exit the Impala with a backpack in hand. TOWLES placed the backpack in the trunk then re-entered the driver seat of the vehicle. Investigators then surveilled the Impala to 140 Moore Drive, Rockville, MD.

  23. On June 2, 2018, Edward TOWLES, utilizing the target telephone, contacted Derrick BOYD. At approximately 9:27 p.m., (TT-7, <u>Activation #191</u>), TOWLES and BOYD began to discuss an unidentified male who is able to sell them assault rifles he is acquiring from an unidentified female. BOYD asked TOWLES, "Did she ever take care of that other situation with him?" TOWLES replied, "Yeah, she took care of him and all that. You know he went over there." TOWLES also said, "She sent him a card and all that," and "She sent some pictures of the toys." BOYD asked, "She ain't have none of that shit we be looking for?" TOWLES responded, "Shit, hell yeah," and subsequently told BOYD, "Yeah, I'll send them. I still got them on the screen. Imma send them to you. You want me to send them to this number?" BOYD responded affirmatively. BOYD asked, "She had some of that big boy shit. That, you know what I mean?" TOWLES responded, "Man, cuz, Imma send them to you. I'm talking about Kriss Vector. Yeah, Kriss Vectors and all of them." Your affiant understands a Kriss Vector is a model of assault

17

rifle. Your affiant understands through training and experience TOWLES is telling BOYD an unknown female is able to acquire guns ("toys") and has sent TOWLES pictures of the guns she is able to acquire ("she sent some pictures of the toys"). Following the conversation, TOWLES sent BOYD a series of 14 MMS text messages from the target telephone to TT-7. The content details of the MMS activations indicated each MMS had two parts (each was labeled part 1 of 2 and part 2 of 2), (TT-7, Activations #336, 338, 340, 342, 344, 346, 348, 350, 352, 354, 356, 358, 360 and 362). As a result, through your affiant's training and experience, your affiant understands there were only seven images of firearms sent in total. The final MMS, (TT-7, Activation #362) occurred at approximately 2:23 p.m. The text messages appeared to be representations of the firearms the seller was able to procure, as well as a description and price, with the majority of the images appearing to come from web pages, to include GunBroker.com

24.     On June 3, 2018, at approximately 4:42 p.m., (TT-7, Activation #402), BOYD contacted TOWLES on the target telephone. BOYD asked, "Yeah man, why the fuck didn't you get that mini man?" BOYD then clarified, "That Drake." TOWLES replied, "I got one." TOWLES continued, "Not a mini though. I got the, oh yeah, the mini. I don't got the micro, I got the mini." BOYD asked, "Why didn't you get the micro joint?" BOYD then told TOWLES, "I'm trying to get this for the same number that's on the screen, right?" TOWLES told BOYD, "I'm sure, I'm sure they gonna put their tax on." BOYD asked, "See how much they want for the uh... for the joint next to the mini and the joint and the mini." TOWLES asked, "You talking about the black one?" BOYD answered, "Yeah, both of them joints." Based upon training and experience, your affiant understands that TOWLES and BOYD were discussing Draco assault weapons ("That Drake"), and TOWLES informed BOYD he already has purchased a mini Draco for himself ("I got one;" "Not a mini though"). Your affiant further understands when BOYD

18

discusses "what's on the screen," BOYD is referring to the pictures sent to him by TOWLES over TT-8, which included picture of a Draco micro assault rifle. In that picture, the Draco micro assault rifle was positioned next to a black Draco mini assault rifle (which your affiant believes TOWLES referred to as "the black one"). Your affiant also understands TOWLES tells BOYD the guns are going to be more expensive than the prices listed on the pictures ("I'm sure they gonna put their tax on it").

25.     As the conversation continued, BOYD stated, "Alright, so everything setup. So I just need to link up with him, man, so he can bust it up and really get in depth with what's going on for real." TOWLES replied, "That's what's up. I told y'all. I been told y'all to exchange numbers. Keep having me in the middle." Shortly thereafter, TOWLES stated, "I'd like for boy y'all to talk because both of y'all buys, y'all got y'all own binkes… you know what I'm say? Y'all ain't some regular person out there. I'm gone hit him and see when y'all can link up." Lastly, your affiant understands that TOWLES was trying to get the seller and BOYD to exchange phone numbers and coordinate for the sale directly. However, TOWLES informs BOYD that he would contact the seller ("I'm gone hit him") in order to see when BOYD and the seller could meet.

26.     At approximately 4:48 p.m., (TT-7, Activation #403), TOWLES called BOYD on TT-7 using the target telephone. BOYD asked, "What's up, slim?" TOWLES responded, "Yeah, he said tomorrow." Based on training and experience, your affiant understands that TOWLES informed BOYD that TOWLES arranged for BOYD to purchase the guns the following day on June 4, 2018.

27.     On June 4, 2018, at approximately 1:06 p.m., (Activation #620), BOYD contacted TOWLES on TT-8 using TT-7. TOWLES informed BOYD, "I got a Drake for you for 12."

19

BOYD asked, "You got the short joint? The micro?"   TOWLES replied, "Nah, it's the other joint. It's cool though."   BOYD indicated to TOWLES that he did not want the other one.   TOWLES replied, "He got some, said he wanted to get rid of that short one. Hold on a sec."   Shortly thereafter, TOWLES asked BOYD, "Oh, ok, ok.   Shoot, you want me to ask him about that micro joint."   BOYD replied, "Shit."   TOWLES asked again, "You don't want the other one, right?"   BOYD replied, "Nah."   TOWLES responded, "Alright."   Your affiant understands TOWLES informed BOYD that the seller had a Draco macro assault rifle for sale, but BOYD instead wanted a micro ("You got the short joint? The micro?").   Your affiant further understands that TOWLES agreed to follow up with the seller as to the seller's ability to provide BOYD with a Draco micro assault rifle ("you want me to ask him about that micro joint").

28.   At approximately 1:09 p.m., (Activation #621), TOWLES called BOYD on TT-7 using TT-8.   TOWLES told BOYD, "He said 13."   Your affiant understands that TOWLES told BOYD that the seller indicated that he had a Draco micro assault rifle and that the seller's price for that firearm was $1,300 ("13").   BOYD subsequently responded, "Alright, you huh, if you got it on you just grab it. I give it to you."   TOWLES replied, "I ain't got it on me. I don't be coming out the house with shit."   BOYD responded, "Alright, I'm at work and shit.   He ain't gone let it go no time soon, right? Tell him I want the joint. I just gotta, you know."   Your affiant understands BOYD agreed to the price and asked TOWLES to pay for the firearm for him ("if you got it on you just grab it").   TOWLES informed BOYD that he did not have the money on him ("I ain't got it on me").   Your affiant further understands that BOYD asked the seller to keep the micro Draco for him and to not sell it to someone else ("I want the joint" and "He ain't gonna let it go no time soon, right?").   At this point in the conversation, TOWLES is then recorded stating, "Bruh, he said he want it for sure.   He at work.   He said don't let it go."   Based on your affiant's review of

the call, your affiant believes that TOWLES was speaking to the seller, who was present with TOWLES, in the background.   Your affiant further understands that TOWLES informed the seller not to sell the firearm to someone else, because BOYD wanted to purchase the weapon.

29.     On June 15, 2018, at approximately 1:42 p.m., (Activation #12), TOWLES placed an outgoing call on the target telephone to an unknown male (hereafter UM 3482) at telephone number (240) 370-3482.   TOWLES asked, "What, you got right now?"   UM 3482 replied, "I'll give you a deal on the (unintelligible), that gelato."   TOWLES asked, "What you talking about?" UM 3482 replied, "Give me five for it."   TOWLES asked, "Alright, that's a bet. How many you got?" UM 3482 replied, "I just got a half of a key, the other joint."   Based on training and experience, your affiant understands that TOWLES asked UM 3482 was narcotics UM 3482 was able to sell ("What you got right now").   UM 3482 informed TOWLES he had a strain of marijuana ("gelato") available at a price of $500 ("give me five for it").   TOWLES asked UM 3482 how much marijuana UM 3482 had available, and UM 3482 responded that he had 500 grams of another type of narcotic available ("I just got a half of a key, the other joint").   The phone call was dropped.   At approximately 1:44 p.m., (Activation #13), TOWLES used the target telephone to call UM 3482 back on (240) 370-3482. TOWLES asked, "What the last thing you heard me say?" UM 3482 responded, "Yeah, you got to text me, I'm in a bad area."

30.     On June 19, 2018, approximately 4:45 p.m., (TT-8, Activation #459), TOWLES, received an incoming call on the target telephone from an unknown male (hereafter, UM 3893). During the course of the call, TOWLES asked UM 3893, "Yeah you straight?   Buck just called me." UM 3893 responded, "Yeah I'm straight.   I wanna smoke.   On my mother, I'm trying to see him."   TOWLES asked, "Who?"   UM 3893 responded, "Man, that joint just sneezed on me." TOWLES's replied was unintelligible.   UM 3893 repeated, "Man, that joint just real sneezed on

me, bruh." TOWLES asked, "Who the fuck was it though?" UM 3893, "That's the little nigga, he be up, I know exactly where he at, bruh. I want to smoke, bruh. I swear to god, bruh, on my mother." TOWLES replied, "Alright, bruh. I just came in the fucking house. Who around there with you?" UM 3893 replied, "Just me and Dave Martin." Based on training and experience, your affiant believes that UM 3893 informed TOWLES that he wanted to kill an individual ("I wanna smoke. On my mother, I'm trying to see him.") TOWLES then asked UM 3893 who it was that UM 3893 wished to kill, and UM 3893 indicated that the he wanted to kill the person who had shot at him ("that joint just sneezed on me.") TOWLES then asked for more information about who this person was, and UM 3893 indicated that he knew where the person was and he wanted to kill him ("That's the little nigga, he be up, I know exactly where he at, bruh. I want to smoke, bruh.").

31.     On June 19, 2018, approximately 10:34 p.m., (TT-8, Activation #499), TOWLES placed an outgoing call on the target telephone to UM 3893. During the course of the call, TOWLES informed UM 3893, "Hey you know my people just sent me a picture of slim, right." UM 3893 replied, "Yeah." TOWLES continued, "You know that nigga was like, I could call that nigga my little brother while we was locked up." UM 3893 replied, "Who?" TOWLES explained, "Chino. His name is Chino. They called him Chino. We was locked up together. That was like my little brother." UM 3893 responded, "Oh yeah?" TOWLES continued, "Yeah I'ma cancel, I'ma call that off for real. Because slim ain't on nothing. He was chilling while we was locked up. He wasn't on no bull shit." Based on training and experience, your affiant believes that TOWLES informed UM 3893 that someone had sent him a picture of individual that UM 3893 sought to kill ("my people just sent me a picture of slim"). TOWLES then informed UM 3893 that TOWLES recognized the individual in the picture as an individual with whom he

was close and with whom he had been incarcerated, who goes by the name "Chino" ("I could call that nigga my little brother while we was locked up"). TOWLES then informed UM 3893 that he was withdrawing his authorization for UM 3893 to kill the individual who shot him (Chino) due to TOWLES's relationship with Chino ("I'ma cancel, I'ma call that off for real. Because slim ain't on nothing. He was chilling while we was locked up. He wasn't on no bull shit."). UM 3893 replied, "Yeah. Nah, he a cool little dude." TOWLES stated, "I'm telling you I know him. I saw his picture. I know him personally. He used to come to the dorms with me and all that. He used to give me food and all that shit." UM 3893 replied, "Yeah." TOWLES stated, "I ain't know. That shit crazy. But, shit, I'ma call it off. I already jive like called it off. But, I'ma definitely call it off now that I see who it is." UM 3893 replied, "Yeah." TOWLES, "I'ma just tell them it's family on the other side or some shit like that." UM 3893 replied, "Alright." Based on training and experience, your affiant believes that, when UM 3893 expressed displeasure with TOWLES's decision ("Yeah. Nah, he a cool little dude."), TOWLES reiterated that he knew Chino and that Chino was good to TOWLES ("I saw his picture. I know him personally. He used to come to the dorms with me and all that. He used to give me food and all that shit"). TOWLES then confirmed to UM 3893 that he was calling off the hit on Chino, now that TOWLES knew Chino was the intended target ("But, shit, I'ma call it off. I already jive like called it off. But, I'ma definitely call it off now that I see who it is."). TOWLES further indicated that TOWLES would tell others involved in the dispute that Chino was related to him. Your Affiant further understands through his training and experience that in order for TOWLES to have the authority to stop an attempted murder, he would have to be in a position of authority over UM 3893.

32. On June 19, 2018, approximately 10:50 p.m., (TT-8, Activation #500), TOWLES, placed an outgoing call to an unknown male (hereafter, UM 7951) at 202-809-7951. During the

course of the call, TOWLES told UM 7951, "Not saying you was, but just in case you was, don't get involved with that Paco shit." UM 7951 responded, "Oh, nah, fuck no." TOWLES explained, "I just found out that nigga that, uh, I called that nigga my little brother when we was locked up together." UM 7951 replied, "Mhmm." TOWLES replied, "It ain't Riff. It's a whole another nigga. But the nigga cool as shit. You know what I'm saying?" UM 7951 replied, "Yeah." Based on training and experience, your affiant believes that TOWLES told UM 7951 not to become involved in the dispute between UM 3893 and Chino. ("Not saying you was, but just in case you was, don't get involved with that Paco shit.") UM 7951 indicated that he was not going to get involved. TOWLES then informed UM 7951 that the target of the planned hit was not Riff, but rather was another individual with whom TOWLES is close ("It ain't Riff. It's a whole another nigga. But the nigga cool as shit. You know what I'm saying?"). Your Affiant understands through his training and experience TOWLES is telling UM 7951 to stay out of a fight between UM 3893 and Chino. Your Affiant further understands that once again, this call indicates TOWLES is in a position of authority where he is able to direct other individuals and exercise a measure of control over their actions.

33.     On June 22, 2018, at approximately 8:40 p.m., (Activation #846), TOWLES made a call using the target telephone to UM 3482 on (240) 370-3482. UM 3482 asked, "You sleeping or what? I sent you a text message of a picture, but I figured out what it was." TOWLES replied, "Oh yeah?" UM 3482 said, "But I see it now. Imma get that joint, too." TOWLES asked, "For what?" UM 3482 responded, "Just to, it ain't…" and TOWLES interjected, "Nah man, for what you get two of them? Those are the best ones." UM 3482 replied, "Yeah, I'm getting that joint because they giving me uh, a Glock 20." Based on training and experience, your Affiant understands UM 3482 sent a picture of a handgun to TOWLES that UM 3482 hoped TOWLES

24

would identify, but UM 3482 figured out the type of firearm on his own ("I sent you a text message of a picture, but I figured out what it was").  UM 3482 indicated that he was going to purchase two handguns, to include a Glock 20 ("Imma get that joint, too," and "I'm getting that joint because they giving me uh, a Glock 20").

34.  On June 25, 2018, at approximately 2:11 p.m., (Activation #1142), TOWLES received a call on the target telephone from UM 3482 on (240) 370-3482.  UM 3482 said, "Yeah, I saw somebody my little cousin know.  He supposed to be calling me back to let me know where the big man mind at.  Find some glick." Based on training and experience, your affiant understands that "glick" is a street term for a gun.  TOWLES asked, "What number he say for that glick?"  UM 3482 asked, "The first one I sent you?"  TOWLES clarified, "Nah, the second one."  Based on training and experience, your affiant understands that UM 3482 sent pictures of two guns to TOWLES, and that TOWLES asked UM 3482 for the price of the gun in the second picture UM 3482 sent to him ("what number he say," and "Nah, the second one").  UM 3482 replied, "My little cousin said 550, but I don't know, I have to see." Based on training and experience, your affiant understands that UM 3482 told TOWLES his cousin quoted him a price of $550 for the firearm.  TOWLES stated, "Let me get that glick."  UM 3482 replied, "You know I get first pick, right?"  TOWLES replied, "The XD better."  UM 3482 said, "He supposed to have a rack of joints." Based on training and experience, your affiant understands that TOWLES told UM 3482 he wanted one of the guns ("let me get that glick"), and UM 3482 reminded TOWLES that UM 3482 got first pick of the guns.  UM 3482 further told TOWLES that the seller was in possession of a large number of guns ("he supposed to have a rack of joints").  At approximately 8:20 p.m., (Activation #1192), TOWLES placed an outgoing call on the target telephone to UM 3482 on (240) 370-3482.  TOWLES asked, "You ain't get a number for it yet?"

UM 3482 asked, "For what?"  TOWLES clarified, "The pictures you sent me."  UM 3482 responded, "Oh nah dude, man, he trying to sell me some other shit.  He got rid of them two joints two hours before man man got over there." Based on training and experience, your affiant understands that TOWLES asked UM 3482 whether UM 3482 had confirmed the price of the firearms. UM 3482 informed TOWLES that the firearms had already been sold ("He got rid of them two joints two hours before man man got over there").  TOWLES replied, "Oh alright." UM 3482 continued, "Yeah, he some out of town nigga.  He supposed to be coming off the studio. I'm trying to move this Perc." Based on training and experience, your affiant understands that UM 3482 informed TOWLES that UM 3482 was also trying to illegally sell Percocet ("I'm trying to move this Perc.").

35.     On July 5, 2018, at approximately 2:10 p.m. (Activation #2123), TOWLES placed an outgoing call on the target telephone to an unknown male (hereafter UM 6935) on telephone number (202) 903-6935.  During the course of the conversation, TOWLES told UM 6935, "Shit, I got your text, there's a joint around for 21, but that joint at my house."  Based on training and experience and knowledge of the investigation into TOWLES and others known and unknown, your affiant believes that TOWLES informed UM 6935 that he had a firearm ("joint") available for sale for a price of $2,100 ("for 21"), but that the firearm was located at his residence.  UM 6935 replied, "Man, you late as shit, man."  TOWLES replied, "Why you saying that?" UM 6935's response was unintelligible; TOWLES replied, "Huh?" UM 6935 clarified, "I said, I got a joint for 9."  TOWLES asked, "For 900?"  UM 6935 replied, "For 9, yeah. And it actually good." Based on training and experience, your affiant believes that UM 6935 told TOWLES that TOWLES was too late in responding ("you late as shit") because UM 6935 had already been able to acquire a firearm for $900 ("I got a joint for 9").  As the conversation continued, UM 6935

26

informed TOWLES, "I was trying to get that Drizzy from you too, but you ain't hit me back." TOWLES responded, "Nah, nigga, it wasn't what you wanted. He bullshitted." UM 6935 replied "Oh, he bullshitted. I had a feeling, cause you ain't call me back." TOWLES responded, "Yeah, he bullshit. It wasn't what he said it was." Based on training and experience, your affiant believes that UM 6935 informed TOWLES that UM 6935 had been trying to obtain a Draco assault rifle (a "Drizzy") but that TOWLES had not contacted him back. TOWLES informed UM 6935 that the firearm wasn't what the person selling TOWLES the firearm had led him to believe ("he bullshitted"), and that it was not what UM 6935 had wanted ("it wasn't what you wanted").

### Traffic Stop and Search Warrant on July 10, 2018

36.     On July 10, 2018, members of Montgomery County Department of Police, Special Investigations Division, Drug Enforcement Section were conducting covert surveillance at 140 Moore Drive, Rockville, Montgomery County, Maryland. At approximately 2:00 p.m., Detective Chad Bleggi observed Edward TOWLES, who was previously identified by his Maryland Driver's License photograph, exit the main entry door of the residence. TOWLES opened the trunk of a black Chevrolet Impala with Maryland registration 5DF8904, hereinafter referred to as "the vehicle," which was parked in the driveway of the residence. TOWLES approached the trunk of the vehicle and removed a small black backpack from his shoulder a placed it into the trunk of the vehicle. TOWLES then entered the driver's seat of the vehicle as the sole occupant and left the residence in the direction of Frederick Avenue.

37.     Detective Bleggi conducted a pace of the Impala on North Stonestreet Avenue for approximately .3 miles and determined that the Impala was traveling at a speed of 36 mph in a 25 mph zone. In addition, the vehicle was then observed to have heavy tinting material on the rear window, in violation of the Maryland Traffic Article. The material was dark enough that

Detective Bleggi, when positioned directly behind the vehicle, was unable to observe any silhouettes in the vehicle or any objects in broad daylight on a sunny day. Detective Bleggi has specific training from the Maryland State Police in the identification of illegal tinting materials.

38.     After following the vehicle for a short distance, a traffic stop was conducted by Officer William Weill, Montgomery County Department of Police, 6th District Community Action Team, at the request of Detective Bleggi on west bound Falls Road on top of the Interstate 270 over pass in the left turn lanes. Officer Weill approached the vehicle and made contact with the operator, later identified through his Maryland Driver's License as Edward L. Towles having a date of birth of May 23, 1989. Officer Weill immediately detected a powerful odor of fresh marijuana emanating from the passenger compartment of the vehicle. Officer Weill knew the odor to be marijuana based upon his training, knowledge, and experience as a proactive enforcement officer and hundreds of contacts with marijuana. Officer Marshall Weider arrived on the scene at the request of Officer Weill and requested TOWLES exit the vehicle. TOWLES exited the vehicle. TOWLES indicated that the vehicle belonged to his girlfriend, who he identified as STEPHANIE PAULINO.

39.     Out of an abundance of caution, Officer Weill requested a certified Controlled Dangerous Substance K9 respond to the scene of the traffic stop. Within minutes of the initial stop Detective Scott Carson, Montgomery County Department of Police, Special Investigations Division, Drug Interdiction Team responded to the scene of the stop. Detective Carson deployed his CDS K9 "Riggs" for a free air sniff of the vehicle which resulted in a positive "hit" at the driver's door.

40.     Officer Weider utilized an issued tinting material reader which indicated that the vehicle tint was approximately 16% light transmittal contrary to the allowed 35% light transmitted

by Maryland law.

41.     TOWLES spoke with Officer Weider and indicated that he had been traveling from his girlfriend's residence at which time he provided the address of 140 Moore Drive, Rockville, Montgomery County, Maryland.  TOWLES was asked by Officer Weider if he also lived at the residence location, and TOWLES indicated that he did.

42.     A probable cause search yielded a large fold of US currency in various denominations in the center console area in excess of $1,200.  Officer Weill and Officer Weider opened the trunk of the vehicle and observed the same black back pack that Detective Bleggi had observed TOWLES placing in the vehicle a short time earlier.  Detective Carson conducted a search of this bag which yielded three bags of suspected marijuana in various amounts with a total weight of approximately 1 pound, a small ziplock bag with approximately 25 small bags of an off-white powdery substance with an approximately weight of approximately 13 grams, a digital scale, and an extended .45 caliber magazine with live ammunition.  Officer Weill assisted with the search and located a Glock handgun bearing serial number BEKM136 behind the trunk wall carpet lining near the vehicle battery.  Officer Weill noted that the handgun was loaded with a live round in the chamber and additional live rounds in the magazine of .45 caliber.  Officer Weill conducted a field test of off-white powdery substance utilizing a NARK II test kit.  The field test showed a positive reaction for heroin.

43.     At the time that that Officer Weill conducted the traffic stop, TOWLES received an incoming call on the target telephone from PAULINO, on (301) 828-5867 (July 10, 2018, at approximately 1:44 p.m., Activation #2644).  During the course of the conversation, TOWLES informed PAULINO that he had been pulled over due to the tint on his windshield.  Moreover, the call recorded the voice of a law enforcement officer informing TOWLES that he had detected

29

the odor of marijuana and would, therefore, search the vehicle.

44.     Later on July 10, 2018, your affiant obtained and executed a United States District Court for the District of Maryland, Search and Seizure warrant for 140 Moore Drive, Rockville, Maryland, signed by the Honorable Gina L. Simms, United States Magistrate Judge.   During the search of this residence members of law enforcement found and seized several items of suspected marijuana, several items of narcotics distribution paraphernalia (to include numerous items of packaging ranging from bulk to small zip-top baggies, digital scales, razors, marijuana growing equipment), firearms magazines, several rounds of ammunition, receipts from the purchase of firearms parts, a suspected ledger of firearms orders, an unregistered silencer[5], and the **TARGET DEVICES[6]** listed below:

| Item # | Brief Description |
|--------|------------------|
| 000048 | LAPTOP, SILVER APPLE LAPTOP S/N: W89516CA7XJ WITH CHARGER |
| 000049 | LAPTOP, GRAY HP LAPTOP S/N: CND84130YK |
| 000051 | CELL PHONE, SAMSUNG SM-G930P. MEID DEC: 089 476 327 104 739 168 |
| 000055 | CELL PHONE, SAMSUNG GALAXY S6 EDGE.   MODEL SM-G925P.   DC: 256 691 544 801 582 197 |
| 000056 | CELL PHONE, ALCATEL MODEL A570BL |
| 000057 | LAPTOP, DELL LAPTOP SERVICE TAG: HT9X5Q1 |
| 000066 | CELL PHONE, IPHONE A1688, PINK COLORED BACK. |

[5] This item was examined by an expert and was found to fit the definition of a "firearm" under 18 U.S.C. Section 921(a)(3)(C), a "firearm silencer" under 18 U.S.C. Section 921(a)(24), a "silencer" under 18 U.S.C. Section 921(a)(24) and a "firearm silencer" under 26 U.S.C. 5845(a)(7).   Additionally, this silencer bears no NFA manufacturer's marks of identification or a serial number as required by 26 U.S.C. Section 5842.

[6] Your affiant notes that some of the devices were seized from the Mercedes-Benz C300 sedan, bearing license plate number 6CP7869, which is registered to STEPHANIE PAULINO at 140 Moore Drive, Rockville, MD, which was parked on the curtilage of 140 Moore Drive, Rockville, Maryland at the time of the execution of the search warrant.

| | |
|---|---|
| 000067 | CELL PHONE, LG-C410 IMEI: 013 808 008 710 486 |

The **TARGET DEVICES** seized were held as evidence on the premises of the ATF at 90 K Street N.E., Washington, D.C., where they remain.

45.     At the time of the execution of this search warrant Stephanie PAULINO was present at 140 Moore Drive, Rockville, MD.   PAULINO stated to law enforcement officers that the residence belonged to her and that TOWLES also stayed at that residence with her.

46.     While law enforcement was conducting a search of the residence, a notebook was located on a chair in the living room.   Based on your affiant's training and experience he believed this item to be a narcotics ledger, containing a list of suspected narcotic weights.   All of the numbers were listed in a fashion that would indicate that they were being added together.   At the bottom of the list of numbers, a total was listed with the label "g", indicating a total weight in grams.   At the outset PAULINO was shown the document and asked if it was her handwriting, she stated it was.   When asked what the significance of the writing was PAULINO initially stated that the numbers were vehicle miles documented for her employment.   PAULINO further stated that she needed to document the miles she drives for work so she could be financially reimbursed. Upon further questioning PAULINO admitted that she was not telling the truth and further that the numbers were weights of narcotics.   PAULINO stated that TOWLES called her and gave her the information written on the paper.

## CONCLUSION

47.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the **TARGET DEVICES** (as described in Attachment A and incorporated

herein by reference) contain evidence of the target offenses, as well as, evidence of identification, that would further establish the Defendants' commission of the target offenses (as described in Attachment B and incorporated herein by reference).

48.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

49.     I further request that the Court permit the search warrant to be executed at any time given that the Devices are contained on the premises of ATF.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:   December $\underline{27}$ , 2018

_____
Steven Letteney, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Sworn and subscribed this _____ day of December, 2018.


_____
The Honorable Robin M. Meriweather
United States Magistrate Judge
For the District of Columbia

32